IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GENA GOLDEN, an individual, and SUSAN GOLDEN, an individual,<br><br>*Plaintiffs*,<br><br>v.<br><br>MENTOR CAPITAL, INC., a Delaware corporation, LABERTEW & ASSOCIATES, a Utah limited liability company, and MICHAEL L. LABERTEW, an individual,<br><br>*Defendants*.<br><br>MENTOR CAPITAL, INC., a Delaware corporation,<br><br>*Third-Party Plaintiff*,<br><br>v.<br><br>RICHARD GOLDEN, an individual, and SCOTT VAN RIXEL, an individual,<br><br>*Third-Party Defendants*. | MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>Case No. 2:15-cv-00176-JNP-BCW<br><br>Judge Jill N. Parrish |

Before the court is Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 70) (the "Motion"). The court held oral argument on the Motion on January 31, 2017. Plaintiffs Gena and Susan Golden (the "Goldens") seek summary judgment on Count I of the Second Amended Complaint against Defendant Mentor Capital, Inc. ("Mentor") for violation of the Securities Act of 1933. Specifically, the Goldens argue that Mentor was not authorized to issue the shares it

sold to them in March 2014 because it failed to comply with the Bankruptcy Court's Order Confirming Mentor's Plan of Reorganization and, consequently, those shares were invalidly issued and not exempt from the Securities Act's registration requirement. Mentor opposes the motion, arguing that genuine disputes of material fact preclude summary judgment.

**I.     Undisputed Facts**

1. Mentor[1] filed for bankruptcy in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") in August 1998.

2. Mentor filed its Third Amended Plan for Reorganization (the "Plan") on September 30, 1999, and a supplement to that Plan on December 2, 1999.

3. On January 11, 2000, the Bankruptcy Court confirmed the Plan ("Order Confirming Plan") and incorporated it into the bankruptcy court's order.

4. The Plan allowed Mentor to issue several classes of warrants to its creditors. The warrants were exercisable for shares of Mentor's common stock at various prices, depending on the class of warrant held.

5. Section 6.4(a) of the Plan provides that "[t]o the extent provided in § 1145 of the [Bankruptcy] Code, the New Equity Securities [defined in the Plan to include the warrants] . . . and all securities issued in exchange therefor or on conversion thereof, shall be exempt from the registration requirements of the Securities Act of 1933, as amended . . . ."

6. Section 1.1 of the Plan defines the "Effective Date" of the Plan as "the date on which [Mentor] files the amendment to its articles of incorporation required by §6.7 hereof."

---

[1] Mentor was formed as a California corporation in July 1994 as Main Street Athletic Clubs, Inc. It later changed its name to Main Street AC, Inc. The caption for the bankruptcy proceedings named Main Street AC, Inc., dba Mentor Capital as the debtor. Main Street AC, Inc. later changed its name to Mentor Capital, Inc. On September 2, 2015, Mentor Capital, Inc., a California corporation, merged into Mentor Capital Inc., a Delaware corporation. (Dkt. No. 77, Ex. A).

7. Section 6.7 of the Plan provides:

> 6.7 <u>Amendment of Articles of Incorporation</u>: Not later than 120 days after Confirmation [May 10, 2000], [Mentor] shall file amendments to its articles of incorporation which provide for:
>     (a) Authorization of sufficient shares of its common stock to permit issuance of the New Common Stock, the shares issuable on exercise of all Warrants to be issued under this Plan, and such additional common stock as [Mentor] considers appropriate to have available for future transactions; and
>     (b) Prohibit the issuance of nonvoting equity securities.

8. Section 6.8 of the Plan provides:

> 6.8 <u>Validity of Corporate Actions</u>: Pursuant to § 1400 of the California Corporations Code, Confirmation shall constitute due authorization required for the full validity, enforceability, and effectiveness of all transactions provided for in this Plan, notwithstanding any provisions of the California General Corporation Law which would otherwise require approval of such transactions by the Debtor's board of directors, shareholders, or otherwise. Confirmation shall constitute authorization for Debtor's Responsible Individual designated under B.L.R. 4002-1 to take all actions and execute, deliver and file all certificates, notices, and other documents as he deems necessary or appropriate to consummate the transactions provided for in this Plan, including certificates of amendment of the Debtor's Articles of Incorporation.

9. There is no evidence that amended articles of incorporation were filed within the prescribed 120-day period. The office of the California Secretary of State has no record of such an amendment, there is no mention of an amendment in any document, and no testimony that such amendment was filed.

10. On March 21, 2008, Mentor filed a Certificate of Amendment of Articles of Incorporation of Mentor Capital, Inc. (the "2008 Amendment"). The 2008 Amendment states that "[t]he total number of authorized common shares is unchanged at 400,000,000."

11. The only other amendment on file with the California Secretary of State is an amendment filed December 10, 2007. The filing record indicates that this amendment changed the name of the company from Main Street AC, Inc.

12. Mr. Scott Van Rixel was the recipient of warrants that were issued to Mentor's creditors as contemplated under the Plan.

13. In late February 2014, Mr. Richard Golden was looking for an investment opportunity for his wife, Plaintiff Gena Golden, and his daughter, Plaintiff Susan Golden.

14. Mr. Van Rixel informed Mr. Golden of a potential investment opportunity to purchase Mentor stock.

15. Mr. Van Rixel showed Mr. Golden a letter that Chester Billingsley, CEO of Mentor, had written to Mr. Van Rixel representing that the shares in Mentor were unrestricted and freely tradeable.

16. Mr. Van Rixel offered to front the purchase price for the Goldens' purchase of the Mentor shares and indicated that Mr. Golden could then pay him back.

17. The Goldens and Mr. Van Rixel sought to confirm with Mentor that the shares were unrestricted. Mr. Billingsley responded via e-mail that "The [shares] are unrestricted and fall under the exemption from registration afforded under Section 1145 [of the Bankruptcy Code]."

18. Mr. Golden decided to commit funds on behalf of Gena and Susan to purchase the Mentor shares.

19. Mr. Golden paid Mr. Van Rixel $146,250.00 for 75,000 shares of Mentor stock through the issuance of two checks, both dated March 20, 2014.

20. Mr. Van Rixel e-mailed Mr. Billingsley, "I wanted to know if I was able to put the shares I committed to in different peoples [sic] names as I would like to use them as thank you's [sic] for peoples [sic] efforts in helping us make the decision to move forward with you." Mr. Van Rixel was informed that he could put the shares in other people's names.

21. On March 21, 2014, Mentor received a check for $204,750.00, dated February 28, 2014, from Mr. Van Rixel. The check, which was drawn on the account of the Scott J. Van Rixel Family Trust, was for the purchase of 105,000 shares of Mentor common stock at a price of $1.95 per share.

22. On March 23, 2014, Mr. Van Rixel requested that Mentor issue 25,000 shares in the name of "Gena Golden" and 50,000 shares in the name of "Susan K. Golden, Rev Trust, u/a/d 11 May 1999."

23. Four days after receiving the check from Mr. Van Rixel, Mentor sent confirmation letters addressed to Susan and Gena Golden.[2] The letters stated: "Attached please find a confirming copy of your February 28, 2014 check #8030 for $204,750.00. Part of this remittance to complete the exercise of your MNTR warrants, which have now been converted to [50,000 in the case of Susan and 25,000 in the case of Gena] shares."

24. Mentor later issued 50,000 shares of stock to Susan and 25,000 shares of stock to Gena Golden, as requested by Mr. Van Rixel.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In applying this standard, the court must "construe the

---

[2] At the request of Mr. Van Rixel, the confirmation letters were sent to his address in Florida and not directly to the Goldens.

evidence and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002); *see also Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) ("The nonmoving party is entitled to all reasonable inferences from the record . . . ."). However, the nonmoving party "is entitled to only those inferences that are 'reasonable.'" *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1004 (10th Cir. 2014).

A dispute of fact is genuine when "a reasonable jury could find in favor of the nonmoving party on the issue." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712 (10th Cir. 2014). And only genuine disputes of *material* fact can preclude the entry of summary judgment. *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). The nonmoving party has the burden of "present[ing] affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "[A] party opposing a motion for summary judgment may not rest on mere allegations or denials to demonstrate there is a genuine issue of material fact for trial . . . ." *Sammons v. Allenbrand*, 817 F. Supp. 94, 95 (D. Kan. 1993) (citing *Liberty Lobby*, 477 U.S. at 256). Rather, "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also* DUCivR 56-1.

Where there is "no genuine issue as to any material fact," the court need only apply the relevant substantive law to the undisputed facts[3] in order to determine if Defendants are entitled to judgement as a matter of law. *See* Fed. R. Civ. P. 56(a); *BancOklahoma Mortg. Corp. v.*

---

[3] The court notes that it may consider materials in the record not directly referenced by the parties in their briefing in order to decide this Motion. Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

6

*Capital Title Co.*, 194 F.3d 1089, 1097 (10th Cir. 1999) (indicating that, under Rule 56, district courts must determine "whether any genuine issue of material fact [is] in dispute, and, if not, whether the moving party [is] entitled to judgment as a matter of law").

## III. Analysis

The Goldens seek partial summary judgment on Count I of their Second Amended Complaint, Violation of Securities Act of 1933. Count I alleges that Mentor violated Section 12 of the Securities Act of 1933 (the Securities Act), 15 U.S.C. § 77*l*, when it sold unregistered securities to the Goldens and misrepresented to them that those securities were exempt from registration.

Section 12 of the Securities Act provides:

Any person who—

> **(1)** offers or sells a security in violation of section 77e [Section 5] of this title or
> **(2)** offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading . . .

shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

§ 77*l*(a). By its terms, proving a violation of subsection 1 of Section 12 requires a plaintiff to prove a violation of Section 5 of the Securities Act.

Section 5 of the Securities Act prohibits the sale of a security "unless a registration statement is in effect." § 77e. But Section 5's prohibition on the sale of unregistered securities does not apply to exempt transactions. *See, e.g.*, § 77d (listing exempt transactions); *Allison v.*

7

*Ticor Title Ins. Co.*, 907 F.2d 645, 648 (7th Cir. 1990) ("[E]ach sale [of securities] must be registered or exempt."). One such exemption is found in the Bankruptcy Code (the "Bankruptcy Exception"), which provides that Section 5 of the Securities Act of 1933 does not apply to:

> (1) the offer or sale under a plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan--
> > (A) in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate; or
> > (B) principally in such exchange and partly for cash or property;
> (2) the offer of a security through any warrant, option, right to subscribe, or conversion privilege that was sold in the manner specified in paragraph (1) of this subsection, or the sale of a security upon the exercise of such a warrant, option, right, or privilege;

11 U.S.C. § 1145.

To establish a Section 5 violation, a plaintiff must point to evidence that: (1) "no registration statement was in effect as to the securities"; (2) the defendant "sold or offered to sell the securities"; and (3) "the sale or offer was made through interstate commerce." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 212 (3d Cir. 2006). "Once a plaintiff makes out a *prima facie* case that the securities offered or sold were not registered, the defendant bears the burden of demonstrating its entitlement to an exemption." *Busch v. Carpenter*, 827 F.2d 653, 656 (10th Cir. 1987); *Quinn & Co. v. SEC*, 452 F.2d 943, 945–46 (10th Cir. 1971). "The exemption relied upon must be strictly construed against the person claiming its benefit, as public policy strongly supports registration." *Id.* at 946 (footnotes omitted).

### A. Standing

At the outset, Mentor opposes the Goldens' Motion for Summary Judgment by arguing that a genuine dispute of fact exists regarding their standing to bring their Section 12 claim. Mentor argues that the Section 12 claim is predicated on the sale of stock from Mentor to the Goldens, inasmuch as Section 12 provides for liability only "to the person purchasing [a]

security from [it]." Mentor maintains that there is no credible evidence as to who bought stock from whom. But the Goldens maintain that there is no dispute about the facts surrounding their acquisition of the securities from Mentor and that they have standing to bring their Section 12 claim as the purchasers of the securities in question.

The court concludes that there is no genuine dispute of material fact relating to standing. While the parties dispute the legal ramifications of the undisputed facts, the court need only apply the relevant substantive law to those facts to determine if the Goldens have standing as purchasers. *See* Fed. R. Civ. P. 56(a); *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1097 (10th Cir. 1999) (indicating that, under Rule 56, district courts must determine "whether any genuine issue of material fact [is] in dispute, and, if not, whether the moving party [is] entitled to judgment as a matter of law").

Section 12 of the Securities Act gives purchasers a private right of action to sue for violation of the Act. *See Pinter v. Dahl*, 486 U.S. 622, 643–44 (1988); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–32 (1975); Melissa K. Stull, Annotation, *Persons Entitled to Relief Under Civil Liability Provisions of § 12 of Securities Act of 1933 (15 U.S.C.A. § 77l)*, 113 A.L.R. Fed. 575 (2017). But the Securities Act does not define "purchase" or "purchaser." *Pinter*, 486 U.S. at 645. The Supreme Court has clarified that "[a]t the very least . . . the language of § 12(1) contemplates a buyer-seller relationship not unlike traditional contractual privity." *Id.* at 642. "Thus, it is settled that § 12(1) imposes liability on the owner who passed title, or other interest in the security, to the buyer for value." *Id.* But it is not clear who qualifies as a purchaser in a situation where the person to whom title is passed is not the person who paid for the security.

9

At least one court has encountered a factual scenario similar to the one presented here. In *Lewis v. Walston & Co., Inc.*, the plaintiff, McDonald, purchased stock with money that was supplied to him by his relatives. 487 F.2d 617, 622 (5th Cir. 1973), *abrogated on other grounds*, *Pinter*, 486 U.S. at 649. McDonald intended to distribute the shares to those relatives once the stock went public. Nevertheless, McDonald purchased the stock in his own name and the seller sent McDonald an "investment letter" confirming his purchase. The Fifth Circuit held that McDonald was a "purchaser" with standing to bring his Section 12 suit. It explained:

> [I]t seems to us that the record compels the conclusion that McDonald was recognized as the "purchaser" of this stock. To be sure, the record does indicate that the money for the purchases was supplied by his relatives and that McDonald *intended,* on the stock's going public, to distribute shares to his relatives proportionate to the amounts they had paid. *But the key fact is that the stock purchased with the relatives' money was purchased in McDonald's name and as far as the parties were concerned, he was, for all intents and purposes, the owner of the stock.* McDonald . . . was never issued certificates on the Allied Automation stock he bought; the only document evidencing his ownership was the letter of investment intent, and that letter showed McDonald as the sole purchaser of the entire block of shares.

*Id.* at 622 (emphasis added).

Here, it is undisputed that the Goldens were the recipients and owners of the securities in question. Although Mr. Van Rixel sent a check to Mentor to pay for the shares, he informed Mentor that he wanted some of the shares that he was paying for to be issued in other people's names as "thank you's [sic]." And it is undisputed that Mr. Golden agreed to reimburse Mr. Van Rixel for the shares that would go to the Goldens. In accordance with that understanding, Mr. Golden later wrote two checks reimbursing Mr. Van Rixel for the cost of the Goldens' shares.

The court concludes that the shares at issue were purchased by the Goldens. The Goldens paid for the securities. And, as was the case in *Lewis*, the confirmation letters were addressed to the Goldens and the shares were eventually issued in their names. Indeed, Mentor later

10

acknowledged in an e-mail[4] from its CEO, Chet Billingsley, that Mentor "issued separate warrant certificates" for the Goldens and that "[f]or administrative convenience Scott [Van Rixel] issued a single check to pay for all shares and then he received checks from the Goldens to reimburse him at cost a few days later." And Mentor acknowledged that it "treated [the sale] as an original purchase [by the Goldens], not a resale, right from the onset." As far as anyone involved in the transaction was concerned, the Goldens were the owners of the shares and were therefore the purchasers. Even though Mr. Van Rixel sent one check to Mentor, the Goldens later reimbursed him for their portion of the purchase price. Accordingly, the Goldens are "purchasers" and have standing to bring their Section 12 claim against Mentor.

### B. The securities sold to the Goldens are not exempt under 11 U.S.C. § 1145

Mentor does not dispute that the Goldens have made a prima facie case of a violation of Section 5 of the Securities Act. The undisputed evidence shows that "no registration statement was in effect as to the [Mentor] securities," Mentor "sold . . . the securities" to the Goldens, as discussed above, and "the sale . . . was made through interstate commerce." *See Berckeley Inv. Grp.*, 455 F.3d at 212. The burden therefore shifts to Mentor to establish that the Bankruptcy Exemption[5] applies in this case. To determine whether the Bankruptcy Exception applies, the court must determine whether the securities were sold under a plan of reorganization.

---

[4] Mentor filed an Objection [Dkt. No. 80] to the court's consideration of this and other evidence attached to the Goldens' Reply Memorandum in Support of the Motion for Partial Summary Judgment. Mentor cites DUCivR 56-1(d), which provides that "[i]n the reply, a moving party may only cite additional evidence not previously cited in the opening memorandum to rebut a claim that a material fact is in dispute. Otherwise, no additional evidence may be cited in the reply memorandum, and if cited, the court will disregard it." However, the evidence attached to the Goldens' reply addresses Mentor's arguments regarding the Goldens' standing under Section 12. Mentor also makes a passing argument regarding authentication. But Mentor conceded at oral argument that it did not dispute the authenticity of the documents, and particularly the e-mail upon which the court now relies. Therefore, Mentor's Objection [Dkt. No. 80] is **OVERRULED**.

[5] Mentor has posited that other exemptions may apply to the transaction with the Goldens. But Mentor never raised another exemption, or even the possibility of another exemption, in any pleading or motion.

1) Jurisdiction

Mentor first argues that all issues related to interpretation of the Plan, or any controversies arising therefrom, should be decided by the Bankruptcy Court for the Northern District of California. Mentor relies on Article XI of the Plan, which provides that "the Bankruptcy Court shall retain jurisdiction to enforce the provisions, purposes, and intent of this Plan including, without limitation . . . [r]esolution of controversies and disputes regarding interpretation of this Plan."

"The confirmation of a Chapter 11 plan does not automatically terminate the jurisdiction of the bankruptcy court." *In re Tri-L Corp.*, 65 B.R. 774, 778 (Bankr. D. Utah 1986) (citing *In re A.J. Mackay Co.*, 50 B.R. 756, 759 (Bankr. D. Utah 1985)). "This jurisdiction is necessary to settle disputes concerning the administration of the plan as they arise . . . ." *A.J. Mackay Co.*, 50 B.R. at 759. A bankruptcy court is allowed to "expressly retain jurisdiction over the plan, during its consummation, under a provision of the plan itself or the order of confirmation." *Tri-L Corp.*, 65 B.R. at 778. However, the continuing jurisdiction of a bankruptcy court in not interminable and "[a] reservation of jurisdiction beyond what is necessary to effectuate the plan of reorganization is beyond the power of the bankruptcy court." *Id.*

Although Mentor argues that the Bankruptcy Court has retained jurisdiction to interpret the Plan, it does not argue that the Bankruptcy Court's jurisdiction is exclusive or that this court lacks jurisdiction to interpret the Plan in the case before it. Further, Mentor has not moved the court to stay this matter so that a declaratory ruling can be obtained from the Bankruptcy Court and, to this court's knowledge, no such proceeding has been commenced before the Bankruptcy Court. Accordingly, the court will interpret the Plan to resolve the issue now before it.

        2)       Because Mentor failed to comply with the terms of the Plan, it never became effective

The Goldens argue that Mentor is not entitled to the Bankruptcy Exemption found in Section 1145 of the Bankruptcy Code because the Plan never became effective. The Goldens reason that the Plan became effective only upon the filing of amended articles of incorporation, which Mentor failed to file within the requisite period. This failure is the fulcrum of the Goldens' Section 12 claim inasmuch as Section 1145 of the Bankruptcy Code exempts only securities sold "under a plan." Absent an effective plan, the securities Mentor sold were unregistered and not subject to an exemption from registration. Mentor responds that the Plan became effective on the date it was confirmed and that a material dispute of fact exists on the issue of whether it complied with the terms of the Plan. The court will consider Mentor's arguments in turn.

        i.       By its terms, the Plan was to become effective on the Effective Date, not on the date of confirmation

The Plan states that the "Effective Date" is the date on which Mentor files an amendment to its articles of incorporation, as required by Section 6.7 of the Plan.[6] Because Mentor did not file amended articles of incorporation with the California Secretary of State within the 120-day window prescribed by Section 6.7, the Goldens argue that the Plan never became effective. Mentor responds that the Plan became effective on January 11, 2000, the date that the Bankruptcy Court issued its Order Confirming Plan, and that the term "Effective Date" refers only to certain actions to be taken under the Plan, not to the Plan's overall validity and effectiveness.

---

[6] Mentor objects to paragraphs 8, 9, and 10 of the Declaration of Peter Benvenutti, the Goldens' expert witness, on the grounds that the statements therein are conclusory and form the basis of an improper opinion beyond the scope of Federal Rule of Evidence 702. After reviewing Mr. Benvenutti's declaration, the court concludes that Mentor's objection to Mr. Benvenutti's opinion regarding the effectiveness of the Plan in paragraphs 8 and 9 is well-taken. However, paragraph 10 simply summarizes the results of Mr. Benvenutti's search of Mentor's corporate records on file with the Secretary of State of the State of California. Accordingly, the court **SUSTAINS** the objection with regard to paragraphs 8 and 9, but **OVERRULES** it with regard to paragraph 10.

While the Bankruptcy Code does not define the term "effective date," one commenter has stated that "it is almost universally understood that the effective date of a plan is the 'date on which the provisions of a plan of reorganization become effective and binding on the parties.'" Harold S. Novikoff, *Post Confirmation Issues: Ascertaining the Effective Date; Post-Confirmation Jurisdiction; Serial Filing; Post Confirmation Litigation Vehicles* 1 (2007) (available at www.lexisnexis.com/documents/pdf/20080411104921_large.doc) (quoting Kenneth K. Klee, *Adjusting Chapter 11: Fine Tuning the Plan Process*, 69 Am. Bankr. L.J. 551, 560-61 (1995)). And the Bankruptcy Code provides that the effect of confirmation of a plan is to bind the debtor and each creditor to the terms of the plan. 11 U.S.C. § 1327(a). While this would seem to indicate that the confirmation date is the date on which a plan becomes effective, that is not the case. In the same article, which Mentor cites, the author explains that most plans provide for a specific effective date that will typically be some date "following confirmation of the plan on which [the plan] becomes binding and distributions commence." Novikoff, *supra* at 2; *see also In re Potomac Iron Works, Inc.*, 217 B.R. 170, 172 (Bankr. D. Md. 1997) ("Generally, the 'effective date' is understood as the date upon which distributions commence.").

Thus, although the confirmation date may act as the effective date in a plan that does not otherwise specify an effective date, the date that a plan is confirmed is not also necessarily its effective date. *See* Benjamin Weintraub & Michael J. Crames, *Defining Consummation, Effective Date of Plan of Reorganization and Retention of Postconfirmation Jurisdiction: Suggested Amendments to the Bankruptcy Code and Bankruptcy Rules*, 64 Am. Bankr. L.J. 245, 277 (1990) ("Effective Date is the date upon which a *confirmed* plan becomes operative and distribution of property and cash is commenced." (emphasis added)). Further support for this conclusion is found in the Bankruptcy Code itself, which refers to the "effective date" of a plan when

discussing the requirements for confirming a plan, which is an indication that an effective date and confirmation date are not necessarily the same. 11 U.S.C. § 1129 (requiring a court to confirm a plan only if certain requirements are met, including nine requirements that reference "the effective date of the plan").

Here, Mentor's Plan specified an Effective Date that is different from the date of confirmation. And it is clear that the Plan becomes operational on the Effective Date. For example, it is the Effective Date on which the amount of claims was to be determined,[7] on which interest began to accrue on certain claims,[8] and on which other ministerial and administrative actions for distributions were to be undertaken.[9] And most notably, in Section 6.7, the Plan explicitly requires that Mentor file its amended articles of incorporation no later than 120 days after confirmation.

In spite of these and other provisions in the Plan, Mentor maintains that Section 6.8 of the Plan rendered the Plan effective upon confirmation. But this position is simply inconsistent with the terms of the Plan. Section 6.8 of the Plan does not provide that the Plan becomes effective upon confirmation. Rather, Section 6.8 authorizes Mentor to implement the actions required under the Plan without obtaining approval of its board of directors, shareholders, or otherwise. Section 6.8 specifically states that it was included in the Plan pursuant to § 1400 of the California Corporations Code which grants "full power and authority to put into effect and carry out any

---

[7] E.g., Section 3.1 of the Plan provides that holders of claims shall receive cash "in the amount of such claims on the Effective Date."

[8] E.g., Sections 3.3(a) and 5.3 of the Plan provides that if a claim "has not been allowed on the Effective Date, the holder shall receive such payment within thirty days after the Debtor receives notice that such claim is an Allowed Claim, together with interest thereon from the Effective Date at the rate of eight percent (8%) per annum."

[9] E.g., Section 3.2 requires the holder of a claim to "notify the Debtor in writing of its partial or complete election [to receive warrants or common stock in exchange for its claim] prior to the earlier of (a) ninety days after the Effective Date or (b) the holder's receipt of [c]ash on account of such portion of their claim;" Section 6.3 requires Mentor to issue certain restricted shares "[n]ot later than sixty days after the Effective Date;" and Section 6.4(c) restricts transfer of New Common Stock issued under the Plan "for eighteen months following the Effective Date."

plan of reorganization and the orders of the [bankruptcy] court or judge . . . [and to] do any act provided in the plan . . . without further action by its board or shareholders." Thus, under Section 6.8 of the Plan and § 1400 of the California Corporations Code, Mentor was authorized by the California legislature to take actions, such as the filing of an amendment to its articles of incorporation, that were required by the Plan without first obtaining board or shareholder approval. But nowhere does Section 6.8 provide that the Plan as a whole will become effective upon confirmation.

Mentor also argues that Section 6.4(a)—the section exempting from registration the warrants or other securities issued under the Plan—is not conditioned upon the filing of an amendment to Mentor's articles of incorporation. In essence, Mentor maintains that once the securities were issued, they were exempt under Section 1145 of the Bankruptcy Code regardless of whether Mentor had filed amended articles of incorporation rendering the Plan effective. Although Section 6.4(a) of the Plan does not state that it becomes effective only on the Effective Date of the Plan as a whole, other provisions of the Plan that provide for the issuance of securities under the plan are tied to the Effective Date.[10]

Mentor also argues that the Order Confirming Plan supports its position that the Plan was effective on the date of confirmation. The Order Confirming Plan required Mentor to submit a post-confirmation status report to the Bankruptcy Court "not later than one month after 90 days after entry of this order" detailing Mentor's progress in implementing the Plan. Mentor was required to report on progress made during the 90-day period following confirmation, including its progress in "whether the order confirming the Plan has become final . . . [and] whether

---

[10] E.g., Section 5.3 provides that holders of priority claims (as defined by the Bankruptcy Code) could elect to receive shares of stock plus sixteen warrants by notifying Mentor of their election within 90 days after the Effective Date; and Section 6.3 requires Mentor to issue restricted shares and other securities no later than sixty days after the Effective Date.

16

delivery of securities required to be distributed under the Plan have commenced or been completed." Mentor posits that there would have been no post-plan progress on which to report had the court intended that the Plan would become effective only on the date on which Mentor filed its amended articles of incorporation. The court is not persuaded by this argument inasmuch as Mentor could have filed its amended articles of incorporation immediately after confirmation of the Plan. And the Bankruptcy Court not only required a report on Mentor's progress in consummating the Plan during the first 90 days after confirmation, but also ordered "[f]urther reports addressing [progress toward consummation of the Plan] every three months [after the initial report] until entry of a final decree."[11] Because the filing of the amended articles of incorporation was required to occur within 120 days of confirmation, it was very possible that no progress would have occurred in the first 90 days. In short, the fact that the Bankruptcy Court required progress reports says nothing about when the Plan was to become effective.

        ii.        There is no dispute that Mentor failed to file an amendment to its articles of incorporation as required by Section 6.7 of the Plan

Mentor next argues that there are disputes of fact as to whether Mentor satisfied the Plan's requirement that it amend its articles of incorporation.

Section 6.7 required that Mentor amend its articles of incorporation to 1) authorize sufficient shares of its common stock to permit issuance of the securities under the Plan, and 2) to prohibit the issuance of nonvoting equity securities. When originally formed, Mentor authorized 40 million shares of common stock. At some unknown point in time, the number of Mentor's authorized shares common stock was apparently increased to 400 million. Mentor's CEO, Mr. Billingsley, testified in his declaration that he remembers working with Mentor's

---

[11] Neither party has put forward any evidence on the substance of Mentor's reports addressing its progress toward consummation of the Plan. Moreover, Mentor does not claim that the Effective Date was modified or waived the court.

17

attorneys after confirmation of the Plan to prepare amended articles in accordance with the Plan, but acknowledged that he never received a confirmed copy of the amendment from the California Secretary of State. Even though there is no amendment on file with the California Secretary of State meeting the requirements of Section 6.7 and no evidence that such an amendment was filed, Mentor asserts that an amendment authorizing additional shares had to have been filed sometime before March 21, 2008, the date on which another amendment was filed with the California Secretary of State stating that "[t]he total number of authorized common shares is *unchanged* at 400,000,000." (emphasis added).

Even assuming this to be the case, it does not create a genuine dispute of material fact. Mr. Billingsley never testified that an amendment meeting the requirements of Section 6.7 was filed. While the March 21, 2008 amendment may give rise to an inference that Mentor amended its articles to increase the number of authorized shares at some point in time, there is no evidence supporting Mentor's contention that it filed the amendment within 120 days of the confirmation of the Plan. And even assuming that Mentor filed an amendment increasing the number of authorized shares from 40 million to 400 million at some point during the 120 days allowed in the Plan, there is no evidence that Mentor filed within the 120-day period an amendment that prohibited the issuance of nonvoting equity securities.[12] In short, the 2008 amendment filed with the California Secretary of State eight years after confirmation of the Plan is not evidence that Mentor increased the number of authorized shares within 120 days from confirmation of the Plan or that it amended its articles to prohibit the issuance of nonvoting equity securities. Therefore, there is no evidence that Mentor complied with the requirements necessary to render the Plan effective.

---

[12] The only mention of this second requirement is in Mr. Billingsley's declaration where he states that Mentor has never issued nonvoting equity securities. But this does not support the conclusion that Mentor's articles were amended to prohibit such an issuance, as was required under the Plan.

18

Mentor finally argues that the court should evaluate the totality of the circumstances to determine whether Mentor has substantially complied with the terms of the Plan. Substantial compliance is a contract law doctrine meant to "assist the court in determining whether conduct should, in reality, be considered the equivalent of compliance under the contract." *Wolfe ex rel. Joseph A. v. N.M. Dep't of Human Servs.*, 69 F.3d 1081, 1086 (10th Cir. 1995) (quoting *Peckham v. Gem State Mut. of Utah*, 964 F.2d 1043, 1052 (10th Cir. 1992); *see also Connell v. Higgins*, 150 P. 769, 775 (Cal. 1915) (recognizing contract doctrine of substantial performance and defining it as meaning "that there has been no willful departure from the terms of the contract" and that a party will not forfeit his right to recover under the contract "by reason of trivial defects or imperfections in" performance of the contract). But this contract doctrine does not apply to the Plan.

Courts have likened confirmed Chapter 11 bankruptcy plans to contracts that specify the rights and obligations of the debtor and its creditors. *See In re Dial Bus. Forms, Inc.*, 341 F.3d 738, 743 (8th Cir. 2003) ("Once confirmed, a Chapter 11 plan acts like a contract that binds the parties that participate in the plan." (internal quotation marks omitted)); *In re Victory Mkts., Inc.*, 221 B.R. 298, 303 (2d Cir. B.A.P. 1998) ("[T]he Bankruptcy Code establishes the general rule that 'the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor . . . .' For this reason, a confirmed plan holds the status of a binding contract as between the debtor and its creditors."). However, because a confirmed Chapter 11 plan is also an order of the bankruptcy court, the analogy between Chapter 11 plans and contracts can only extend so far. *See In re Dial*, 341 F.3d at 744.

Courts that liken confirmed Chapter 11 bankruptcy plans to contracts often do so only for purposes of interpreting them. *E.g.*, *id.* at 743 (explaining that the case turned on the proper interpretation of the plan and likening it to a contract); *In re Victory Mkts.*, 221 B.R. at 303 ("As with any contract, the starting point for review of a plan is its plain language."). Mentor has cited no authority supporting its contention that the substantial compliance doctrine applies to confirmed Chapter 11 plans, or any other court order for that matter.[13] The Plan was explicit in requiring that Mentor "shall file amendments to its articles of incorporation" within 120 days after confirmation and that the Plan would not become effective until it did so. The undisputed facts show that Mentor failed to file the required amendments, and thus the Plan never went into effect.

## IV. Conclusion

For the foregoing reasons, the court ORDERS that the Goldens' Motion for Partial Summary Judgment on Count I of their Second Amended Complaint (Dkt. No. 70) is GRANTED.

DATED September 22, 2017.

_____
Judge Jill N. Parrish
United States District Judge

---

[13] Some courts have recognized substantial compliance as a defense to a charge of contempt. *See, e.g.*, *Bauchman v. W. High Sch.*, 906 F. Supp. 1483, 1494 (D. Utah 1995) (citing an unpublished Tenth Circuit case and a Ninth Circuit case). But "[w]hile some courts have recognized substantial compliance as a defense in a contempt proceeding, [the Tenth Circuit] has not previously recognized the defense in a published opinion." *Phone Directories Co. v. Clark*, 209 F. App'x 808, 815 (10th Cir. 2006). And courts that do recognize substantial compliance as a defense to contempt require a "showing by clear and convincing evidence that 'all reasonable steps' were taken in good faith to ensure compliance with the court order and that there was substantial compliance." *Id.* (citation omitted). Mentor has not only failed to establish that it took all reasonable steps to comply with the Plan; it has failed to point to any authority applying the substantial compliance doctrine to a court order outside of the contempt context.